UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMONTE E. COOK,<br><br>    Petitioner,<br><br>v.<br><br>TAMMY FOSS,<br><br>    Respondent. | Case No. 20-cv-01119-HSG<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Re: Dkt. No. 1 |

Before the Court is the petition for a writ of habeas corpus of Petitioner Timonte Cook, brought pursuant to 28 U.S.C. § 2254, challenging the validity of his state court conviction. Dkt. No. 1 ("Pet."). Respondent has filed an answer to the petition, Dkt. No. 22, and Petitioner has filed a traverse, Dkt. No. 29. For the reasons set forth below, the petition is **DENIED**.

## I.    PROCEDURAL HISTORY

Petitioner was charged in a three-count information with the murder of Rueben Cannon, Jr. (Cal. Penal Code § 187)[1] (count one); shooting at an occupied motor vehicle (CPC § 246) (count two); and the murder of Nicholas Martin (count three). All counts further alleged that petitioner used a firearm causing death in the commission of the offenses, § 12022.53(d). Ans., Ex. 1 ("CT") at 416-18 and Ex. 2 ("RT") at 229-30.[2]

On December 17, 2014, the jury convicted petitioner of second-degree murder of Cannon, first degree murder of Martin, and shooting at an occupied vehicle. It found true the personal use of a firearm enhancements. CT at 1162-64. On February 20, 2015, the trial court sentenced petitioner to a term of 90 years to life. CT at 1271-78.

---

[1] Unless otherwise specified all statutory references are to the California Penal Code.
[2] The exhibits to the Answer are docketed at Dkt. Nos. 23-25. Exhibit citations refer to the ECF page numbers of the filed PDF.

On November 15, 2016, the California Court of Appeal affirmed the judgment of conviction. *People v. Cook*, No. A144563, 2016 WL 6744826, at *17 (Cal. Ct. App. Nov. 15, 2016). On January 25, 2017, the California Supreme Court denied review. Ans., Ex. 8. (Dkt. No. 25).

On April 12, 2018, petitioner filed a state habeas corpus petition, which was denied by the Superior Court on May 21, 2018. Ans., Exs. 9, 10 (Dkt. No. 25). Petitioner's habeas corpus petition was then denied by the California Court of Appeal on January 14, 2019. Ans., Exs. 11, 12 (Dkt. No. 25). The California Supreme Court denied his habeas corpus petition on October 9, 2019. Ans., Exs. 13, 14 (Dkt. No. 25). The state habeas corpus petitions did not raise any issues raised in the direct appeal. *See* Pet. at 7. On February 12, 2020, petitioner filed a federal habeas corpus petition raising the issue of juror misconduct presented in his direct appeal along with the six issues presented in his state habeas petitions. Dkt. No. 1. On January 22, 2021, the Court granted respondent's motion to dismiss the six state habeas corpus claims as procedurally defaulted. Dkt. No. 21 at 8.

## II. BACKGROUND

The following factual background is taken from the November 15, 2016 decision of the California Court of Appeal:[3]

> The 2007 Shooting
> Jerry Lindsey testified that on the morning of October 28, 2007, he was near the intersection of South 20th Street and Maine in Richmond. He saw a car pull up to the intersection and saw three young men get out of the car. [FN 3] All three started firing at a man who turned out to be the victim in count three, Nicholas Martin. [FN 4] Martin returned fire. Many shots were fired and Martin got hit in the chest and fell to the ground. A forensic pathologist testified there were five gunshot wounds on Martin's body, including a fatal wound to his chest.

---

[3] The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004), unless otherwise indicated in this order.

> FN 3: In 2007, Lindsey told a Richmond police sergeant there were two shooters.
>
> FN 4: Lindsey did not know Martin, although he knew Martin was the boyfriend of Mynita Moore, who he knew as Baby.

Lindsey also testified that, prior to the shooting, he observed the three young men and Martin engaged in an altercation nearby. Lindsey identified appellant as one of the shooters in a photographic lineup in 2007 and again in court. A Richmond police sergeant testified Lindsey told him in a 2012 interview that appellant had said something to the effect of "get 'em, kill 'em, get 'em, kill 'em." Lindsey asked to remain anonymous when he spoke to the police in 2007 out of concern for the safety of his family and, although he agreed to testify, he still had those concerns.

Mynita Moore, Martin's girlfriend in October 2007, testified that on the morning of the shooting she physically fought with appellant's aunt. Martin was shot two or three hours later. She was inside her grandmother's house; she heard gunshots and screaming, ran outside, and saw Martin on the ground. She testified she did not see the shooting or the shooters, and denied telling a police detective she knew who the shooters were. A Richmond police detective testified that Moore told him she saw the shooting and that she identified appellant as one of the shooters. She also identified appellant as one of the shooters in a recorded interview that was played for the jury.

The 2010 Shooting
In the evening on November 12, 2010, Demisha Millard and her boyfriend Rueben Cannon stopped in San Pablo to visit Millard's grandmother. There was a large crowd gathered outside, and a fight broke out between Millard's sister and a woman known as Tootie. Millard heard someone yell "he's got a gun," and then there were gunshots. Cannon was shot and killed as he sat in the front seat of his car. A forensic pathologist testified Cannon's body had 14 gunshot wounds.

When she testified, Millard said she did not see anyone with a gun and could not identify the shooter. She did not remember telling the police she had seen the man with the gun and describing his appearance. She did not remember what she said to the police but she remembered she was not truthful with them. She denied being afraid for her family's safety after the shooting.

A San Pablo police detective testified that Millard said she had seen the shooter and that she had described the shooter. Further, two days after the shooting, Millard identified a Facebook photograph of appellant as the man with the gun. Millard said she saw him pointing the gun at the crowd and forcing them to back up. She and Cannon ran towards his car; she ran past the car and hid behind a truck; she saw the shooter pointing the gun at Cannon's car; and she heard gunshots. She ran to Cannon's car and saw he had been shot. Millard

3

> told the detective her sisters had told her not to cooperate with the police due to safety concerns, and she was concerned about the safety of her grandmother and other family living in the Richmond area.
>
> A cousin of appellant's testified appellant was next to her at the time of the shooting. A San Pablo police detective testified the cousin was adamant appellant was not present at the fight when he first interviewed her. The second time he interviewed her, she admitted appellant was present but did not say he was next to her at the time of the shooting. She said appellant became enraged when someone told them Tootie had been pepper sprayed.
>
> The cousin texted appellant the next day to let him know people were saying he had killed someone the night before. He responded, "Soo wat?"

*Cook*, 2016 WL 6744826, at *1-*2 (Cal. Ct. App. Nov. 15, 2016).

### III.    DISCUSSION

Respondent contends that Petitioner's juror misconduct claim fails because the state court reasonably concluded that Juror No. 7 committed no misconduct and displayed no bias that required any further inquiry. *See* Dkt. No. 22-1 at 5-14.

### A.    Standard of Review

A petition for a writ of habeas corpus is governed by AEDPA. This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Greene v. Fisher*, 565 U.S. 34, 38 (2011). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'"

4

*Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003). "Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). Petitioner first raised the remaining claim presented in the instant federal habeas petition in his direct appeal, Ans., Ex. 3 at 13-18 (Dkt. No. 25), and the

California Court of Appeal denied it in a reasoned opinion. *Cook*, 2016 WL 6744826, at *2-*9. In his petition for review to the California Supreme Court, he again raised this claim. Ans., Ex. 7 (Dkt. No. 25). The California Supreme Court summarily denied his petition. Ans., Ex. 8 (Dkt. No. 25). Accordingly, in addressing the instant federal habeas petition, the Court reviews the California Court of Appeal's opinion.

**B.     Analysis**

The California Court of Appeal rejected petitioner's claim that he had shown a reasonable likelihood that Juror No. 7 was actually biased and that trial court had abused its discretion by failing to conduct further inquiry, laying out the relevant background and ruling as follows:

> **I. The Trial Court Did Not Err With Respect to Juror No. 7**
> **A. Background**
> At the start of the proceedings on December 16, 2014, nearly at the close of the prosecution's case, [FN 5] the trial court addressed a note from a juror, in the presence of the juror and counsel but outside the presence of the rest of the jury. The note from Juror No. 7 read, "Should the jurors have concerns about their safety or that of their families?" The trial court acknowledged there had been "some intimations by some witnesses about concerns" and assured the juror that, among other things, the court would "seal all personal identifying information [about the jurors] at the close of the trial."
>
>> FN 5: After the exchange with Juror No. 7, there were no additional live witnesses. Several exhibits were admitted into evidence and a video of Moore's police interview was played for the jury. Then the People rested and the defense rested without putting on any evidence.
>
> *3 The trial court told Juror No. 7 it did not want the juror's concerns to impact his deliberations and the juror responded, "I understand." The court continued that it did not want the juror to "hold it against anybody, particularly against [appellant], in this process because this is merely what witnesses had to say." The court confirmed the juror had not spoken with any other jurors about his concern and asked the juror not to do so, "because I want this trial to be as fair as possible for [appellant]." Juror No. 7 told the court that it had answered his question and that he was "just, you know, concerned." He also told the court, "I have isolated my family, and I'm—I'm fine with that." The court responded, "If there is any [intimidation]—for example, if you ever got approached outside the courtroom walking to your car or have any concerns, we can provide a deputy escort. If anything comes up, please alert one of our deputies." The juror responded "Oh, I will" and then exited the courtroom.

6

Defense counsel expressed concern that, if Juror No. 7 had isolated his family, he might have already concluded appellant was guilty. The court asked counsel, "What more would you like the Court to do? I did make inquiry and admonished him not to have that enter into his deliberations in any way. I also made inquiry as to whether or not he had discussed his concerns with other jurors because I wanted to isolate other concerns and also assuage his concerns in that he would feel comfortable that there isn't such a threat." The court also stated, "And nothing has been done that I can determine that has been an attempt to dissuade or affect the jurors in any way. I haven't been informed of it."

Defense counsel expressed concern Juror No. 7 had determined there was validity to the fears expressed by witnesses and suggested the court inquire further as to the steps the juror had taken to "isolate" his family. The prosecutor suggested further inquiry could heighten the juror's concern and argued the juror had not indicated he had made up his mind about appellant's guilt. Defense counsel pointed out that the juror had taken steps to isolate his family, stating "whatever his thought process is, it has triggered action on his part." The trial court declined to further question Juror No. 7 because "what steps he's taken to isolate his family would not further illuminate whether or not he would be a fair juror or whether or not he's made up his mind." The court also commented, "here we have two murders that occurred with a lot of people around, and ... there is a sense of almost astonishment that that many people would be afraid to speak up to point out who the individual was with the gun in both of these circumstances. ... [¶] And so for that to provoke a concern by a juror, I think it's natural and it doesn't necessarily taint them as a juror."

Appellant moved for a new trial on the basis of Juror No. 7's note and comments. The trial court denied the motion. At the hearing on the motion, the trial court stated it wanted "to protect the record a bit" and commented that Juror No. 7's "body language demonstrated to me that he was absolutely with me with regard to being fair." In particular, the juror nodded his head while the trial court was talking to him. [FN 6]

> FN 6: Appellant also describes a verbal altercation between members of the families of Cannon (one of the victims) and Millard (Cannon's girlfriend at the time of the shooting) that occurred in a courthouse hallway in the presence of the jurors. After the incident, the trial court admonished the jurors to ignore the incident. Appellant has not shown that exposure to the incident, which did not directly involve appellant or the jurors, has any tendency to show Juror No. 7 was biased against appellant.

**B. Standard of Review**
"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and

7

willing to decide the case solely on the evidence before it." ' " (*In re Hamilton* (1999) 20 Cal.4th 273, 293–294; accord *People v. Hensley* (2014) 59 Cal.4th 788, 824.) " 'If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard.' " (*Hensley*, at p. 824.)

*4 Although the obligation to discharge a juror who is actually biased is clear, "[t]he decision whether to investigate the possibility of juror bias, incompetence, or misconduct ... rests within the sound discretion of the trial court." (*People v. Ray* (1996) 13 Cal.4th 313, 343.) "The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial. [¶] As our cases make clear, a hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." (*Ibid.*; accord *People v. Manibusan* (2013) 58 Cal.4th 40, 53 (*Manibusan* ).) And "[b]ias in a juror may not be presumed." (*People v. Williams* (1997) 16 Cal.4th 153, 232.)

Appellant argues a more rigorous standard of review applies to the trial court's failure to investigate further, focusing on language in *People v. Lomax* (2010) 49 Cal.4th 530, stating, "Although decisions to investigate juror misconduct and to discharge a juror are matters within the trial court's discretion [citation.], we have concluded 'a somewhat stronger showing' than is typical for abuse of discretion review must be made to support such decisions on appeal. (*People v. Wilson* (2008) 44 Cal.4th 758, 821[ ].)" (*Lomax*, at p. 589.) Appellant fails to appreciate that the " 'stronger showing' " language relates to a decision to discharge a juror. (*Wilson*, at p. 821 ["Although we have previously indicated that a trial court's decision to remove a juror ... is reviewed on appeal for abuse of discretion [citation], we have since clarified that a somewhat stronger showing than what is ordinarily implied by that standard of review is required."].) The "demonstrable reality" test specifies the standard of review for such a discharge decision and mandates a strong showing before a juror can be discharged. (*Lomax*, at p. 589.) But *Lomax* does not articulate a test more rigorous than abuse of discretion for review of a trial court's decision how to investigate an allegation of bias or misconduct. Indeed, the year after *Lomax* was decided, the Supreme Court stated flatly, "Whether and how to investigate an allegation of juror misconduct falls within the court's discretion." (*People v. Allen* (2011) 53 Cal.4th 60, 69.) [FN 7]

> FN 7: At oral argument, appellant relied on several California Supreme Court decisions not cited in his briefs to argue that we review the trial court's decision not to conduct additional investigation into Juror No. 7's possible bias under a more stringent test than abuse of discretion. (See *People v. Beeler* (1995) 9 Cal.4th 953; *People v. Ashmus* (1991) 54 Cal.3d 932;

8

*In re Mendes* (1979) 23 Cal.3d 847.) We reject appellant's reading of those cases. In both *Ashmus* and *Mendes* the Supreme Court held the trial court did not abuse its discretion in discharging a juror because the record showed good cause for the discharge; in *Beeler* the Supreme Court held the trial court did not abuse its discretion in declining to discharge a juror because "[n]othing in the record shows a 'demonstrable reality' that [the juror] was unable to discharge his duties . . . ." (*Beeler*, at p. 989–990; *Ashmus*, at p. 987; *Mendes*, at p. 852.) *Beeler* specifically states, "The court's discretion in deciding whether to discharge a juror encompasses the discretion to decide what specific procedures to employ including whether to conduct a hearing or detailed inquiry." (*Beeler*, at p. 989; see also *Mendes*, at p. 852 [trial court did not abuse its discretion in failing to conduct hearing].)

**C. The Trial Court Did Not Err**
Appellant has not shown a likelihood Juror No. 7 was actually biased and the trial court did not abuse its discretion in failing to conduct additional investigation.

\*5 The California Supreme Court's decision in *People v. Navarette* (2003) 30 Cal.4th 458, is directly on point. There, the defendant argued a juror "developed a bias against defendant because the evidence at trial made him fear defendant." (*Id.* at p. 499.) The juror had sent a note to the trial court during the presentation of the People's case asking, "Has [defendant] seen or have access to the questionnaires? [¶] My concern is for property and family." (Id. at pp. 499–500.) The trial court "assured the jury that no one other than the court, the clerk, and counsel had seen the questionnaires, that they would be placed under seal, and that the identities of specific jurors would not be public information. The court also encouraged the jurors that, if any of them felt unable to be 'fair' and 'unbiased,' to let the court know in writing." (*Id.* at p. 500.)

As in the present case, the defendant in *Navarette* "assume[d] that, because the juror had concerns about his family's safety and the safety of his property, he was therefore biased against defendant, requiring his removal." (*Navarette*, *supra*, 30 Cal.4th at p. 500.) But the Supreme Court concluded the record did not support that assumption because the trial court "specifically asked the jurors to report if they could no longer be fair and unbiased, and [the juror in question] did not pursue the matter further, apparently satisfied by the court's assurances." (*Ibid.*) The Supreme Court held the trial court did not abuse its discretion in declining to remove the juror. (*Ibid.*)

In *Manibusan*, *supra*, 58 Cal.4th 40, the Supreme Court cited Navarette in stating it is "faulty" to reason that "a juror's fear of a defendant establishes bias." (*Id.* at p. 56.) In that case, a juror informed the trial court she was fearful because she saw someone she knew in the courtroom and subsequently discovered the person was a " 'close friend' " of the defendant and his family. (*Id.* at p. 51.) The trial court denied the defendant's request to replace the juror based on

9

her assurance that she was able to be impartial. (*Id.* at p. 52; see also *People v. Brown* (2003) 31 Cal.4th 518, 582 [jurors' fear of retaliation by the defendant's gang did not require hearing into possibility of misconduct where foreperson said fear did not affect their deliberations].)

Appellant argues *Navarette* and *Manibusan* are distinguishable because in those cases the trial court "specifically inquired whether the jurors could still be fair and impartial." In fact, in *Navarette* the opinion reflects that the trial court asked the jurors to report to the court if they felt they could not be fair, not that the court elicited responses from the jurors that they could be fair. (*Navarette*, *supra*, 30 Cal.4th at p. 500.) In *Manibusan* the juror did specifically state she could be impartial, although it is not clear whether she volunteered that or if it was in response to a question from the court. (*Manibusan*, *supra*, 58 Cal.4th at p. 52.) In any event, that the trial court in the present case did not directly ask Juror No. 7 to confirm he could be impartial is not determinative. The court told the juror it did not want his concerns to impact his deliberations and the juror responded, "I understand." The court continued that it did not want the juror to hold any fear against appellant or to speak to the other jurors about it in order to ensure a fair trial for appellant. The juror did not express any confusion or disagreement on those points. The trial court emphasized in denying appellant's new trial motion that the juror's body language indicated his agreement and understanding. Those assurances are equivalent to those in *Navarette* and *Manibusan*.

Appellant also emphasizes that "Juror No. 7 took actions to isolate his family based on his fears." We do not believe that changes the calculus. The fact that the juror took steps to protect his family due to his fear does not show the juror was biased and unable to decide the case based on the facts. It simply demonstrates that, based on what he had heard during the trial, his fear was real. That was an understandable reaction to the testimony, and it does not show the juror was unable to deliberate based on the totality of the evidence. Notably, the juror delivered his note to the court at essentially the close of evidence; that a juror might have formed an impression of the facts after hearing almost all the evidence in the case is not unusual or indicative of bias or an inability to deliberate. Furthermore, the trial court could reasonably have concluded that probing the juror about the specific actions taken to protect his family might have heightened the juror's anxiety without providing much additional insight regarding the juror's ability to deliberate fairly.

*6 The record does not demonstrate a "substantial likelihood" Juror No. 7 was "actually biased." (*Hensley*, *supra*, 59 Cal.4th at p. 824.) Further, because the information before the court did not "constitute 'good cause' to doubt [Juror No. 7's] ability to perform his duties," no further hearing to investigate the possibility of juror bias was required. (*Manibusan*, *supra*, 58 Cal.4th at p. 53.) The trial court did not err.

*Cook*, 2016 WL 6744826, at *2-*6 (Cal. Ct. App. Nov. 15, 2016).

10

The state court's rejection of this claim was neither contrary to nor an unreasonable application of Supreme Court precedent, or based on an unreasonable determination of the facts.

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotation marks omitted). Clearly established Supreme Court precedent "compels a criminal trial court to consider the prejudicial effect of *any* external contact that has a 'tendency' to influence the verdict, irrespective of whether it is about the matter pending before the jury." *Tarango v. McDaniel*, 837 F.3d 936, 946 (9th Cir. 2016) (citing *Mattox v. United States*, 146 U.S. 140, 150-51 (1892)) (emphasis in original). But the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Due process requires only a jury capable and willing to decide the case solely on the evidence before it, and a trial judge watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. *Id.*

Whether a juror is actually biased is a question of fact. *Patton v. Yount*, 467 U.S. 1025, 1036-38 (1984) (explaining that this issue "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed," and noting that "the determination is essentially one of credibility, and therefore largely one of demeanor").

Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties. *Tracey v. Palmateer,* 341 F.3d 1037, 1045 (9th Cir. 2003). *Remmer v United States*, 347 U.S. 227 (1954), and *Smith v. Phillips*, 455 U.S. 209 (1982), do not stand for the proposition that any time evidence of purported juror bias comes to light, due process requires the trial court to question the jurors

alleged to be biased.[4] *Smith* states that this "may" be the proper course, and that a hearing "is sufficient" to satisfy due process. *Tracey*, 341 F.3d at 1044 (citing *Smith*, 455 U.S. at 217, 218). *Smith* left open whether a hearing is always required and what other course might be "sufficient" to alleviate any due process concerns. *Id.*; *see also Estrada v. Scribner*, 512 F.3d 1227, 1241 (9th Cir. 2008) (district court did not abuse its discretion in declining to hold hearing regarding claimed juror bias where state court was not unreasonable in finding two jurors were not actually biased, and juror bias could not be presumed based on jurors' honesty during voir dire); *Davis v. Woodford*, 384 F.3d 628, 652-53 (9th Cir. 2004) (upholding state trial court's implicit rejection of juror bias claim, where juror submitted note to judge before deliberations expressing skepticism about whether defendant would remain in prison if jury returned a noncapital sentence, and judge did not conduct an investigation but provided a detailed instruction that jurors should presume that state officials would properly perform their duties when executing the sentence).

  Here, the court of appeal's decision was not contrary to or an unreasonable application of any clearly established Supreme Court authority. The court of appeal concluded that (1) there was no showing of a likelihood that Juror No. 7 was actually biased; and (2) the trial court did not abuse its discretion in deciding not to conduct additional investigation. *Cook*, 2016 WL 6744826, at *4. This Court agrees: under the circumstances of this case, no Supreme Court case required any form of inquiry different than the trial court made. The trial court met with Juror No. 7, in the presence of the attorneys, and explored whether the juror's concern for his family's safety reflected bias or an inability to be fair. That process was objective and reasonably explored the issues presented, and no United States Supreme Court authority required more. *See Hedlund v. Ryan*, 854 F.3d 557, 574 (9th Cir. 2017) ("The trial judge conducted a hearing involving all interested parties to explore the issue of juror bias. At this hearing, Hedlund had the opportunity to prove actual bias. This is the remedy prescribed by the Supreme Court [in *Smith* and

---

[4] *Remmer*, the only case in which the Supreme Court has remanded to conduct a hearing regarding a juror impartiality issue, involved a direct suggestion of jury tampering. 347 U.S. at 228-230. This case did not involve those circumstances.

12

*Remmer*]."); *Tracey*, 341 F.3d at 1045 ("[E]ven if we were to conclude that the Oregon courts were bound to hold a hearing under *Remmer* and *Smith*, which they were not, a hearing was in fact held. With the parties present and on the record, the trial court questioned [juror] regarding what she had heard. This may not be as in-depth a hearing as contemplated by *Remmer* and *Smith*. But it was the kind of discretionary inquiry best left to the sound judgment of the trial judge who observed voir dire and empaneled the jury."). Notably, Petitioner's traverse cites a number of cases setting out the general legal standards, Dkt. No. 29-1 at 14-16, but cites no Supreme Court (or other) case in support of his actual claims that the trial court's specific actions violated clearly established authority, *id.* at 17-19. Habeas relief is thus unwarranted on this ground.

Nor did the court of appeal base its decision on an unreasonable determination of the facts. Whether a juror is biased is an inherently fact-intensive issue. *See Patton*, 467 U.S. at 1038. "So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness." *Hedlund*, 854 F.3d at 574 (citation omitted). The court of appeal reasonably found that the record "[did] not demonstrate a 'substantial likelihood' Juror No. 7 was 'actually biased,'" and that the information before the trial court did not give rise to good cause to doubt Juror No. 7's ability to perform his duties so as to require any further hearing. *Cook*, 2016 WL 6744826, at *6. Those conclusions were based on a reasonable review of the totality of the record, and habeas relief is thus unwarranted on this alternative ground as well.[5]

---

[5] Petitioner appears to assert another claimed error for the first time in his traverse. He argues that the trial court "questioned [only] Juror No. 7, but not others," and that "the court was clearly derelict in its duty to inquire as to whether any other jurors felt threatened by the fight between the victim's and a witness' families or discussed the incident, and whether any others felt threatened by the testimony that witnesses feared retaliation." Dkt. No. 29-1 at 17, 18. This claim regarding jurors beyond Juror No. 7 was never raised on direct appeal, or in the petition here. *See* Dkt. No. 1 at 2 (asserting that trial court erred by "not discharging a juror"), Dkt. 25-1 at 3-40 (section of Appellant's Opening Brief in the California Court of Appeal regarding this issue, which raised no argument that the trial court erred by not questioning other jurors beyond Juror No. 7), *Cook*, 2016 WL 6744826, at *3 and n.6 (addressing the "verbal altercation" in the context of the argument actually raised with respect to Juror No. 7, noting that "the trial court admonished the jurors to ignore the incident," and finding that "[a]ppellant has not shown that exposure to the incident, which did not directly involve appellant or the jurors, has any tendency to show Juror No. 7 was

13

## IV.  CONCLUSION

The petition for a writ of habeas corpus is **DENIED**.

A certificate of appealability will not issue because reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the United States Court of Appeals for the Ninth Circuit.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated: 7/12/2022

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

---

biased against appellant."). "A traverse is not the proper pleading to raise additional grounds." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). Nevertheless, a district court "has discretion, but is not required to" consider evidence and claims raised for the first time after the filing of the petition. *See Brown v. Roe*, 279 F.3d 742, 745 (9th Cir. 2002); *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000). This includes new claims raised by a petitioner in the traverse. *See, e.g., Jackson v. Roe*, 425 F.3d 654, 655 n.1 (9th Cir. 2005) (noting magistrate judge's consideration of new claim raised for first time in traverse). The Court declines in its discretion to consider this new argument. Moreover, even were the Court to consider it, the trial court's actions and the court of appeal's affirmance were not contrary to or an unreasonable application of any clearly established Supreme Court authority, and were not based on any unreasonable determination of the facts, for the same reasons discussed above with respect to the Juror No. 7 claim.